ORAL ARGUMENT NOT YET SCHEDULED

APPELLANT'S MEMORANDUM OF LAW AND FACT

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 21-3034

_____

UNITED STATES OF AMERICA,                                    Appellee,

v.

GEORGE TANIOS,                                              Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

_____

L. Richard Walker
Attorney for Appellant
WV State Bar ID 9580
Federal Public Defender Office
Huntington Bank Building
320 W. Pike St., Suite 360
Clarksburg, WV 26301
Tel. (304) 622-3823
E-Mail. Richard_Walker@fd.org
Counsel for Oral Argument

**District Court**
**Cr No. 21-222 (TFH)**

**INTRODUCTION**

George Tanios ("Tanios"), age 39, lives in Morgantown, West Virginia. ECF 19:2.[1]  For fifteen years, he has owned and operated multiple restaurants and convenience stores.  *Id.*  Recently, Tanios operated Sandwich U, which is a well-known restaurant, on a busy street near the campus of West Virginia University. *Id.*  He works over 80 hours a week, creates employment opportunities for people, and gives back to the local community.  *Id.*  As a result, Tanios has deep ties to Morgantown, the WVU community and local small business community.  *Id.*

Tanios learned the restaurant business from his parents, both legal immigrants, who are founding members of a tight-knit Lebanese-American community in New Brunswick, New Jersey.  *Id.*  Tanios lives in Morgantown in a modest townhome with his fiancé, Amanda Plumley, and their three children, ages 4, 8 months, and 8 months.  *Id.*  Tanios graduated high school in 2000, from Saint Peter's Preparatory School, in New Jersey.  ECF 19:3.  He attended Middlesex County College, in New Jersey, prior to starting his career as an entrepreneur.  *Id.*

On January 6, 2021, Tanios attended the rally in Washington, DC, to support President Trump, and he was present on the grounds of the U.S. Capitol during the riot that followed.  Tanios did not enter the Capitol building.  Tanios did not

---

[1]  "ECF_:_" refers to documents on the District Court's docket by ECF number, and, where relevant, at the indicated page.  "3/22:_," 4/27:_" and "5/11:_" refer to the transcripts of the March 22, April 27 and May 11, 2021, hearings.

1

damage property, and he did not assault anyone. Still, the Government believes Tanios assisted and supported co-defendant Julian Khater ("Khater") in Khater's assault on law enforcement with chemical spray at the Capitol. The Government accused Tanios of various criminal offenses, including conspiracy to injure an officer, and aiding and abetting assaults on law enforcement. However, Tanios is ***not guilty***, having ***no*** knowledge of an assault, ***no*** intent to commit an assault and ***no*** agreement to harm anyone.

The District Court erred in detaining Tanios. The Government failed to prove that Tanios is a danger to the community by clear and convincing evidence. Tanios has ***never*** been a member of a hate group or militia. Tanios has ***never*** been convicted of a felony offense. Tanios has ***never*** been previously accused of acts of violence, and he has ***never*** had a reputation for violence.

Specifically, in this appeal, Tanios claims three errors. First, the District Court erred in concluding, as a matter of law, that a presumption of dangerousness applies and, therefore, a presumption of detention exists for defendants, like Tanios, accused of violent crimes at the U.S. Capitol on January 6. Second, the District Court clearly erred in finding that Tanios aided an assault on law enforcement officers and, therefore, should be placed in the erroneous "elevated category of dangerous defendants" undeserving of release under this Court's opinion in *Munchel*. Third, the District Court clearly erred because it failed to find

2

that Tanios posed any articulable future threat in view of his conduct on January 6 and the circumstances of that day.  Accordingly, the detention order should be reversed.

## APPLICABLE LEGAL STANDARDS

"Detention until trial is relatively difficult to impose."  *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).  "[T]he default position of the law . . . is that a defendant should be released pending trial."  *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018).

To detain a defendant on grounds of dangerousness, the government must establish clear and convincing evidence "that ***no*** condition or combination of conditions will reasonably assure the safety of any other person and the community," 18 U.S.C. § 3142(f)(2), or, in other words, that pretrial detention is the ***only*** means by which the safety of the community can reasonably be assured. *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).  The evidence must prove that the defendant ***actually poses a danger***, not that he does so in theory. *United States v. Patriaca*, 948 F.2d 789 (1st Cir. 1991).  The court must consider the nature and circumstances of the offense charged, weight of the evidence, history and characteristics of the person, and nature and seriousness of the danger to any person or the community.  18 U.S.C. § 3142(g).

3

An appeal from a district court's release or detention order is available under 18 U.S.C. § 3145(b).  Factual findings are reviewed for clear error.  *United States v. Smith*, 79 F.3d 1208 (D.C. Cir. 1996).  Legal conclusions are reviewed *de novo*. *United States v. Hanson*, 613 F. Supp. 2d 85, 88 (D.D.C. 2009).

## STATEMENT OF FACTS

### A.  Procedural history.

On March 6, 2021, a complaint charged Tanios and Khater with offenses stemming from their alleged conduct on the Capitol grounds on January 6, 2021. ECF 1.  Law enforcement arrested Tanios at his home in Morgantown, West Virginia, on March 14, 2021, during which he was compliant and cooperative. ECF 10:1.

After an initial appearance in the Northern District of West Virginia on March 15, 2021, Tanios moved for release, given his abundant ties to the community, home, business and family living there.  ECF 10:27.  He remained there until his detention hearing.

On March 17, 2021, a grand jury indicted Tanios and Khater with multiple charges, the most serious being conspiracy to injure an officer and assaults on federal officers with a dangerous weapon.  ECF 8.

4

After the detention hearing, on March 22, 2021, U.S. Magistrate Judge

Michael Aloi found that Tanios is not a flight risk, but detained Tanios under the

theory that he is a danger to the community.  ECF 10:14-23.

On April 20, 2021, Tanios filed a motion for review of the detention order

issued by Magistrate Judge Aloi.  ECF 10, 19.  That day, Khater filed a

memorandum of law in support of pre-trial release.  ECF 18.  The Government

filed an omnibus opposition on April 26, 2021.  ECF 21.  The Honorable Thomas

F. Hogan held hearings on April 27 and May 11, 2021.  On May 11, 2021, Judge

Hogan ordered both men detained pending trial, under 18 U.S.C. § 3142(e).  ECF

25.  Khater appealed on May 25, 2021, and Tanios timely appealed on May 26,

2021.  ECF 28, 30.

This appeal is critical for Tanios, given that Tanios has been in jail for five

months and there is no trial date scheduled in this case.

## B.  The Government's proffer.

Over the course of three detention hearings, the Government merely relied

on a proffer, which it claimed it had a right to do.  Technically, this is correct, *see*

*United States v. Smith* 79 F.3d 1208 (DC Cir. 1996), but the Government has the

burden to prove dangerousness by clear and convincing evidence and the lack of

sworn testimony speaks volumes in terms of the Government's confidence in its

case.  The proffer, which is in dispute because it is inaccurate, incomplete, and

loaded with interpretation, is set forth in the Government's omnibus opposition. ECF 21:2-12.

### C. The evidence presented by Tanios demonstrated that he is not dangerous.

Tanios called nine witness to establish that the he is not a danger to the community in the future.  Magey Tanios, his mother, testified about the family's background and her son's upbringing.  3/22:44.  This is a close-knit family of Lebanese-Americans, involved in a small business in their town in New Jersey.  *Id*. 46-47.  She raised Tanios and his siblings to work 12 hours a day in their restaurant, pray every day, attend church each week and study at the local Catholic School.  *Id*.  She explained that Tanios runs his own restaurants in Morgantown, where he raises his three children now.  She opined that he is a person of good character.  *Id.* 44-46.

Amanda Plumley testified that she has known Tanios for ten years. 3/22:51-55.  They live together with their three small children in a home in Morgantown.  *Id*. 52.  For six years, Tanios worked over 80 hours a week in their sandwich shop, Sandwich University, which serves take-out sandwiches and involves multiple other "virtual kitchens" that offer different types of food.  She described Tanios's straightforward lifestyle:  he works hard and spends time with his family.  *Id*. 54.  She testified that while the arrest of Tanios was stressful, she cooperated with law

enforcement, and subsequently removed all weapons from their home and offered to surrender Tanios's passport.  *Id*. 51-55.

Shadoe Lowers testified that she is a friend and former employee.  3/22:57. While attending West Virginia University, Lowers started working as a bartender for Tanios at his former business, Fourth and Goal.  *Id*.  This was a sports bar in downtown Morgantown, which catered to college students and locals.  Tanios was a reasonable boss.  *Id*. 58-59.  Lowers has observed Tanios in stressful situations with unruly patrons, and he never resorted to violence.  *Id.* 59.  She described Tanios as a great father and a supportive friend.  *Id*. 56-59.

Michael Scottodiluzio is a local business owner in Morgantown.  3/22: 61-62.  He moved to Morgantown a few years ago, opened the Pizza Palace and befriended Tanios.  *Id*.  They collaborated with their two different menus and sold each other's products at their restaurants and agreed to work together in connection with a community service project.  *Id*. 63.  Scottodiluzio described Tanios as trustworthy, honest, and peaceful.  *Id*. 63-64.

Maria Boutros, his sister, testified that their parents came to the United States from Lebanon.  *Id*.  Tanios was the first child baptized in their church in New Jersey.  *Id*. 66.  They went to great schools.  *Id.*  Tanios is family oriented, outgoing, honest, driven and hard working.  *Id*. 67. Tanios is non-violent.  *Id*. 68.

Instead, he supported and created opportunities for his family members with his companies and always wants the best for the people. *Id*. 68-69.

His cousin, Ziad Hage, is a retired correctional officer, who has known Tanios for decades. 4/27:71-72. He testified: "He's a good-hearted father . . . of three children. Every time I talk to him he's either taking care of his kids or working. That's his life. I mean, you know, he would pick his son up from school, drop him off. He would take care of his family. Always asked about his aunts and uncles. He's a kindhearted person. Never had any disrespect towards any type of law enforcement. Never had any bad intentions to harm anyone. I don't even think I ever seen him get into a physical fight, you know, and I've known him my whole life . . . He does not have a bad bone in his body." *Id*. 72-73.

Sean Ruth ("Ruth") was a member of the WV National Guard, 19th Group Special Forces, for 20 years, and participated in two tours in Iraq and one in Afghanistan. *Id*. 65. He lives near Morgantown and is a squad leader at the Mountaineer Challenge Academy, which educates disadvantaged children. *Id*.

Ruth befriended Tanios in 2007 and became a business partner three years ago. *Id*. 66. Ruth described Tanios as a kind person who is non-violent: "As somebody that would wrap up terrorists and evil villains overseas, I was trained to see people that are violent, that are evil-spirited, and he is none of those whatsoever. I would not allow him to come over my house to play with my

daughter, have cookouts with me and if I thought he'd be any type of threat or any danger to my daughter because she is the most important thing in my life." 4/27:67.

Ruth explained that he planned to travel to the rally in DC on January 6, with Tanios and Khater to support Donald Trump, and because they expected it to be historical due to the size of the event. *Id*. 68. Ruth was unable to attend due to his obligations at the Challenge Academy, but there was no discussion about or plan for committing any violence at the U.S. Capitol. *Id*. He added that Tanios is not a member of an extremist organization, such as the Proud Boys or any militia group. *Id*. 67.

William Biddle ("Biddle") works at ATR Performance in Morgantown, which is a firearms and accessory store. 5/11:5-6. Tanios was a regular customer who also partnered with ATR Performance in connection with a charity event held for the homeless over Christmas. On January 5, 2021, Tanios came into the ATR store. There was nothing alarming about that interaction in the store. 5/11:6-7. Tanios was concerned about being protected while at the Trump rally and asked what he could legally take to DC. *Id.* Biddle suggested aerosol sprays. *Id*. Biddle said, "there was nothing that led me to believe that the events that transpired would have transpired." *Id*. 7. If something was alarming about a purchase, Biddle

testified that he would have contacted the ATF, which he is accustomed to doing. *Id*. 7-8.

In addition, Tanios called the FBI Agent, Riley Palmertree, to clarify the evidence against Tanios. 3/22:72. Agent Palmertree reviewed the available videos from January 6, 2021. *Id*. 74. He identified Tanios and interviewed two officers allegedly assaulted about their activities, involvement, and observations at the Capitol. *Id*. 76.

Then, Agent Palmertree interviewed Khater, who said he and Tanios were together at the Capitol on January 6, 2021, and that Tanios carried a backpack for them. *Id*. 77. Khater did not describe an agreement between Khater and Tanios and Agent Palmertree did not determine that the men had a specific agreement to commit a crime. *Id*. 78. Critically, Agent Palmertree testified that Khater never articulated a plan to injure any members of law enforcement. *Id*. 79. In terms of evidence of a criminal conspiracy, Agent Palmertree, merely pointed to the video of Tanios and Khater on Capitol grounds. *Id*. 79, 82. Likewise, Tanios never made any admissions about having knowledge or an intent to injure any law enforcement officers. *Id*. 79.

Finally, Tanios made a proffer about the origin and purpose of the chemical spray. ECF 24:8-9. Tanios proffered that he purchased four containers of non-lethal chemical spray on his own. *Id*. Prior to January 6, 2021, Tanios was acutely

10

aware that Trump supporters had been violently attacked in connection with similar political events by members of other groups opposing President Trump and the Republican Party. *Id.* Tanios made a lawful purchase of these containers at ATR where he knows the staff. *Id.* Nothing sinister was occurring. *Id.* Tanios purchased the items under his own name, and he used his credit card. Tanios inquired whether it would be legal to carry the sprays to DC during the upcoming rally. *Id.* Tanios proffered that he had these items for self-defense, in case he or his companions were attacked prior to, during, or after the rally, by anyone opposed to Trump supporters. *Id.* He proffered that "bear spray," specifically, has a long reach and is effective for use against a group of attackers, which was a fear Tanios had based upon reports of mob attacks upon Trump supporters. Tanios proffered that he had a legitimate fear and that he possessed chemical sprays for a legitimate purpose, namely, to stay safe before, during, and after the rally. *Id.*

Counsel for Tanios added that he discussed the idea of attending the rally with Khater and Ruth. ECF 24:9. They did not plan any violence. *Id.* Mr. Tanios rode with Khater to the rally, but at no time did they discuss harming anyone at the Capitol. *Id.* Tanios had no intention of harming anyone during the rally or the protest at the U.S. Capitol. *Id.* At the Capitol, there was a conversation about brandishing bear spray, but Tanios denied access to Khater and did not relinquish any of the canisters of spray in his possession while on Capitol grounds. *Id.*

11

Tanios did not work with Khater to harm anyone, he did not witness this happening, and he did not even know that Khater sprayed officers until after the event. *Id.*

### D.  The District Court's findings.

The District Court issued a one-page detention order.  ECF 25.  The detention order incorporated the findings set forth in a bench opinion dictated at the May 11, 2021, hearing.  5/11:32-59.  The following is a summary:

1.  Tanios is not a flight risk.  *Id*. 40.

2.  The history and characteristics of Tanios do not weigh in favor of detention, positives including no prior offenses, no felony offenses, ties to the community, financial resources, family and family ties, full employment, and no existing term of parole or probation.  *Id*. 41, 55.

3.  Tanios is charged with multiple felonies.  *Id*. 47.

4.  Tanios purchased various chemical sprays at a gun store after an apparent conversation with Khater on January 5, 2021.  *Id.* 39.

5.  Tanios planned and coordinated with Khater, but the Government's theories are "somewhat challengeable." *Id*. 47.

6.  Tanios engaged in an assault as an aider and abettor.  *Id*. 51-52.

7.  Tanios did not belong to any extremist group of rioters.  *Id*. 52.

8.  Tanios did not engage in broad coordination with many others.  *Id*. 53.

9. Chemical spray is a dangerous weapon. *Id*. 53.

10. Tanios carried canisters of chemical spray that were used to assault law enforcement officers. *Id*.

11. Tanios did not have a leadership role. *Id*. 54.

12. Khater deliberately sprayed officers. Khater had more flagrant conduct than Tanios, but they both acted together and fall in the supposed "elevated category" of dangerousness under *Munchel*. *Id*. 54.

13. *Munchel* sets forth a categorical approach toward the question of whether defendants pose a danger to the community or other persons. It splits defendants in the riot in two "buckets" for the violent and the non-violent so that someone that is a violent defendant is presumed to pose a concrete prospective threat. *Id*. 42-44.

14. This assault was not a direct proximate cause of the breach of the line up and down the Capitol. *Id*. 51.

15. Tanios is a law-abiding, respected individual in the community, with an excellent background, making it difficult to make the conclusion that detention is necessary. *Id*. 54.

13

## ARGUMENT

**A. The District Court erred in concluding, as a matter of law, that a presumption of dangerousness applied and, therefore, a presumption of detention exists for defendants like Tanios accused of violent crimes at the U.S. Capitol on January 6.**

The District Court misinterpreted and misapplied this Court's opinion in

*United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021). It applied a rebuttable

presumption of dangerousness -- not required by *Munchel* or any other precedent --

and in doing so it erred. The District Court found that "*Muchel* sets forth a

categorical approach . . . splitting rioters into two buckets." 5/11:42. In one group,

are the defendants not accused of violence and damage to property and in the

second group are the defendants not so accused. It concluded that "*Munchel*

delineates an elevated category of dangerousness applied to those that fall into the

[violent] category that necessarily imposes a concrete prospective threat." *Id.*

Accordingly, "someone that's a violent defendant is presumed to pose a concrete

and prospective threat . . . ." 5/11:43.

This is the categorical approach the District Court followed to determine that

(a) Tanios's conduct was violent; (b) Tanios falls in a special class of defendants

who should be treated harshly; (c) Tanios is presumed to be dangerous in the

future; and (d) Tanios failed to rebut this presumption despite the abundance of

evidence and sworn testimony indicating that he is a normal, non-violent, family-

oriented businessman who has no felony priors and no connections to militia or extremist groups.  5/11:42-44.

The District Court's misinterpretation of *Munchel* is a striking legal error.  In that case, a son, Eric Munchel and his mother, Lisa Eisenhart, traveled from Tennessee to DC and stormed the U.S. Capitol on January 6, moving through the building with zip ties and a taser.  991 F.3d at 1275-1276.  A grand jury charged them with obstruction of an official proceeding, unlawful entry while armed, and violent entry while armed.  The District Court ordered the defendants detained based on their risk of danger pending trial and they appealed to this Court. The defendants claimed that the District Court's dangerousness determination was clearly error.  *Id*. at 1280-1282.  This Court agreed.  *Id.* at 1283-1284.

In assessing Tanios's risk of danger, the District Court placed too much emphasis on this sentence from *Munchel*:  "In our view, those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."  *Id*. at 1284.

This is only one line in a ten-page opinion written by Judge Wilkins.  It is dicta.  It was not quoted or adopted by Judge Katsas's separate opinion.  This line does not create a new approach for evaluating detention issues in this Circuit.  It

does not mandate that defendants be placed in two separate categories. It does not require a separate, harsher treatment for defendants accused of specific violent offenses. Critically, it does not create a presumption of future dangerousness and should not create a presumption of detention. Rather, it seems that the line is merely intended to remind district court judges that violence is one factor to consider in making a determination about dangerousness.

The District Court misused this line from *Munchel* in even considering this to constitute a new "guideline" to use. 5/11:42. It should not have relied upon one sliver of *Munchel* to change the law at all or even develop a new "guideline," as it clearly did, which materially altered the Bail Reform Act and created an extra burden for Tanios that he is not otherwise required to meet in order to be released from custody pending trial.

It is elementary that inventing a new law without support is error. "Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

**B. The District Court clearly erred in finding that Tanios aided an assault on law enforcement officers and, therefore, should be placed in the erroneous "elevated category of dangerous defendants" undeserving of release under *Munchel*.**

Tanios did not act violently on Capitol grounds. The Government argued and the District Court erroneously found that Tanios "aided and assist[ed]" Khater's assault on law enforcement and "that puts him in the elevated category of dangerousness." 5/11:47-48, 51-55. During three detention hearings, the Government failed to prove this serious allegation by clear and convincing evidence.

Tanios is an ordinary businessman, who is not a member of any extremist organization, hate group or militia. 5/11:52. Tanios communicated with Ruth (a retired U.S. Special Forces solider) and Khater (a college-educated businessman) about attending the political rally in DC on January 6. 4/27:67. Their goal was to show support for President Trump. 4/27:68. Khater was available, but Ruth could not attend the rally due to his obligations at work. 4/27:68. These men did not discuss any violence and there was no evidence of a plan to harm members of law enforcement in DC. 4/27:68-69.

Tanios, on his own, purchased four canisters of chemical spray, under his name, in a familiar store, after asking the manager, Biddle, whether it would be *legal* for him to take these canisters to the rally in DC. ECF 24:8-9. The evidence showed that the canisters were purchased for self-defense and the defense of others

17

in the event Tanios encountered violent counter-protesters opposed to Trump supporters.  ECF 24:8-9; 5/11:6-7.

Khater drove Tanios to DC.  ECF 24:8-9.  The two men attended the rally on January 6 and then proceeded to the grounds of the Capitol.  3/22:77.  Again, there was no evidence that the men had a plan to do violence or that Tanios expected Khater to assault members of law enforcement.  3/22:78-79.  People swarmed the Capitol and, to be sure, Tanios witnessed chaos developing.  ECF 21:4.

At some point, Khater and Tanios separated.  ECF 21:5.  At approximately 2:14 pm, Khater returned to Tanios's location and claimed that someone – Khater did not say who – sprayed Khater with a chemical.  ECF 21:5.  Khater appeared upset and wanted to retrieve "bear spray" from Tanios's backpack.  *Id.*  Clearly, Khater wished to spray whoever sprayed him with chemicals in retaliation.

During this interaction, Khater grabbed a large, white container of "bear spray" from Tanios's backpack.  ECF 21:6.  Tanios and Khater argued for a few minutes.  *Id.*  Tanios refused to relinquish the "bear spray," which was returned to the backpack.  Tanios refused to go along with this wild proposal to spray people with bear spray and tried to dissuade Khater.

Apparently, however, at approximately 2:20 pm, Khater got his hands on a smaller bottle of chemical spray, proceeded to the line of officers protecting the Capitol and sprayed three of them.  ECF 21:6-7.  There is no evidence that Tanios

18

knew Khater accessed the smaller bottle of spray or that Tanios knew Khater

sprayed people.  Tanios was not with Khater at the location of the assault.  Tanios

remained on Capitol grounds and Tanios never approached the line of officers.

Moreover, there is no evidence Tanios agreed with the assault.  Naturally, if Tanios

had agreed with the assault, Tanios would have ***given*** the bear spray to Khater

rather than argue, resist, and retain the bear spray.

The federal aiding and abetting statute, 18 U.S.C. § 2, states that a person

who "aids, abets, counsels, commands, induces or procures" the commission of a

federal offense "is punishable as a principal."  Under § 2 "those who provide

knowing aid to persons committing federal crimes, with the intent to facilitate the

crime, are themselves committing a crime."  *Central Bank of Denver v. First*

*Interstate Bank*, 511 U.S. 164, 181 (1994).  A person is liable under § 2 for aiding

and abetting a crime if he (1) takes an affirmative act in furtherance of that offense,

and (2) with the intent of facilitating the offense's commission.  *See* 2 W. LaFave,

Substantive Criminal Law § 13.2, p. 337 (2003).  A defendant must not just "in

some sort associate himself with the venture," but also "participate in it as in

something that he wishes to bring about" and "seek by his action to make it

succeed."  *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949).  The intent

requirement is satisfied when a person actively participates in a criminal venture

with ***full knowledge*** of the circumstances constituting the charged offense.  *United*

*States v. Pereira*, 347 U.S. 1, 12 (1954); *United States v. Akiti*, 701 F.3d 883, 887 (8th Cir. 2012).

Here, the Government failed to prove that Tanios ***knowingly and intentionally*** participated in Khater's assault on law enforcement on January 6 by clear and convincing evidence. Tanios purchased canisters of chemical spray, but the Government failed to prove that he purchased them with the intent to use on law enforcement, rather than for self-defense. Tanios carried the cannisters of spray to the Capitol grounds in a backpack, but the Government failed to prove that Tanios intended for Khater to take one of the canisters and use it against law enforcement officers protecting the Capitol. Furthermore, the Government failed to prove that Tanios had knowledge, wished to bring about an assault on law enforcement, and sought by his actions to see Khater succeed in an assault.

**C. The District Court clearly erred in failing to find that Tanios posed an articulable future threat to an individual or the community in view of his conduct on January 6 and the circumstances of that day.**

The District Court erred by failing to consider whether Tanios presented an identifiable or articulable future threat to the community or any other person as required by *Munchel* at 1282-1283. In detaining Tanios, the District Court fixated on the offense conduct: "we have egregious actions of the defendant, Mr. Khater, with the assistance of Mr. Tanios, on January 6 that demonstrate they pose a danger to the community regardless . . . of a substantial bond." 5/11:57. The

20

District Court refused to accept that any conditions of bond could "guarantee anything in the nature of protecting the public if this activity that generated this activity occurs again." *Id*. Yet, it never explained how anything like this extremely unusual event could ever occur again.

Here, the District Court presumed a future threat by Tanios, but it never articulated this future threat. The facts, when considered in context of the extraordinary conditions of January 6, show that Tanios is not a threat in the future. There was no evidence presented at the detention hearings showing Tanios has any prior experience using weapons -- including bear spray or any chemical spray -- against law enforcement or any other person. There is no evidence that Tanios has the means of using weapons -- including bear spray or other spray -- in the future against law enforcement, or in an attempt to disrupt the functioning of government. There is also no evidence that Tanios would interact with Khater, at all, in the future for any purpose, let alone for the purpose of violence or threats to any person, group or government.

Importantly, there is no identifiable and articulable danger to "act against Congress" in the future because there is no reasonable explanation of how Tanios would be capable of doing so now that the specific circumstances of January 6 have passed. There has been a successful transfer of power. The United States has a new President. There are no longer massive protests in DC to support President

Trump.  Trump has been banned from Facebook and Twitter.  Thus, it appears

former President Trump will become less relevant during the pendency of this case

and, ultimately, he will fade away and become history.

## CONCLUSION

Tanios is an ordinary businessman, with no prior felony convictions and a

family.  He has been in jail for five months and he does not even have a trial date.

Under the circumstances, and for the reasons stated, this Court should reverse the

Order detaining Tanios.


By:    /s/ *L. Richard Walker*
       L. Richard Walker
       First Assistant Defender
       Attorney for Appellant
       WV State Bar ID 9580
       Federal Defender Office
       Huntingdon Bank Building
       320 W. Pike St., Suite 360
       Clarksburg, WV 26302
       Tel. (304) 622-3823
       E-Mail Richard_Walker@fd.org

**CERTIFICATION OF SERVICE**

I hereby certify that on July 13, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: /s/ *L. Richard Walker*
L. Richard Walker
Attorney for Appellant
WV State Bar ID 9580
Federal Public Defender Office
Huntingdon Bank Building
320 W. Pike St., Suite 360
Clarksburg, WV 26302
Tel. (304) 622-3823
E-Mail. Richard_Walker@fd.org

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to Fed. R. App. P. 32(g) and Fed. R. App. P. 27(d)(2)(A), that the Memorandum Of Law And Fact was prepared in Times New Roman 14 point font and contains 5006 words.

By: /s/ *L. Richard Walker*
L. Richard Walker