ORAL ARGUMENT NOT YET SCHEDULED

APPELLEE'S MEMORANDUM OF LAW AND FACT

————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 21-3034

————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

GEORGE PIERRE TANIOS,                         Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

Channing D. Phillips
Acting United States Attorney

Chrisellen R. Kolb
Elizabeth H. Danello
Gilead Light
Anthony Scarpelli
* Patricia Heffernan, #455761

Assistant United States Attorneys
* Counsel for Oral Argument
555 Fourth Street, NW, Room 8104
Washington, D.C. 20530
Patricia.Heffernan@usdoj.gov
(202) 252-6829

21-cr-00222 (TFH)

On January 6, 2021, a mob overran the United States Capitol to prevent Congress from certifying the result of the presidential election. That day, appellant aided and abetted co-defendant Julian Khater's assault on the Capitol's police defenders: Khater sprayed an unknown chemical substance directly into the faces of three unprotected officers who were guarding security barriers restricting access to the Capitol.

The district court, finding by clear and convincing evidence that appellant poses a danger to the community, ordered him detained pending trial. As this Court recently recognized, "those who actually assaulted police officers . . . and those who aided . . . such action[] are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The district court did not legally err in ordering detention; it conducted a fact-bound, individualized analysis. Nor did it clearly err in finding that appellant aided and abetted Khater and poses a future threat. The detention order should be affirmed.

# BACKGROUND

## Procedural History

On March 17, 2021, the grand jury charged appellant and co-defendant Khater with with offenses stemming from their conduct on the Capitol grounds: conspiracy to impede or injure an officer, 18 U.S.C. § 372; three counts of assaulting, resisting, or impeding certain officers using a dangerous weapon and aiding and abetting, 18 U.S.C. § § 111(a)(1) and (b), and 2; civil disorder, 18 U.S.C. § 231(a)(3); obstructing or impeding an official proceeding, 18 U.S.C. § 1512(c)(2); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon and causing significant bodily injury, 18 U.S.C. § § 1752(a)(1), (b)(1)(A) and (b)(1)(B); disorderly and disruptive conducing in a restricted building or grounds with a deadly or dangerous weapon and causing significant bodily injury, 18 U.S.C. § § 1752(a)(2), (b)(1)(A) and (b)(1)(B); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon and causing significant bodily injury, 18 U.S.C. § § 1752(a)(4), (b)(1)(A) and (b)(1)(B);

2

and engaging in an act of physical violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F) (ECF 8).[1]

On March 22, 2021, after a detention hearing in the Northern District of West Virginia, appellant was ordered held without bond and transferred to the District of Columbia for trial (ECF 10).

On April 20, 2021, appellant filed a motion for review of his detention order, and Khater filed a memorandum of law in support of pre-trial release (ECF 10, 18, 19). The government filed an omnibus opposition on April 26, 2021 (ECF 21). The Honorable Thomas F. Hogan held hearings on April 27 and May 11, 2021 (Docket) and ordered both men detained pending trial, under 18 U.S.C. § 3142(e) (ECF 25). Appellant timely appealed (ECF 30).[2]

---

[1] "Docket" refers to the consolidated docket before the United States District Court for the District of Columbia. "DE:_" refers to docket entries at the indicated page. "ECF_:_" refers to documents on that docket by ECF number, and, where relevant, at the indicated page. "4/27:" and "5/11:" refer to the transcripts of the April 27 and May 11, 2021, hearings. "Mem:_" refers to appellant's memorandum of law and fact.

[2] Khater's appeal, No. 21-3033, is pending before this Court.

## The Detention Proceeding

### *The Government's Proffer[3]*

On January 6, 2021, President Donald Trump held a rally to protest the 2020 presidential election results. *See generally Munchel*, 991 F.3d at 1275. At about 12:30 p.m., a crowd began to assemble near the Capitol, where Vice President Mike Pence was presiding over a joint session of Congress that was scheduled to certify the vote count of the Electoral College (ECF 21:2). Shortly after 2:00 p.m., a mob overwhelmed and overran a United States Capitol Police (USCP) protective barrier; some members of the mob forced their way into the Capitol by breaking windows and assaulting USCP officers while others encouraged and assisted those acts (ECF 21:2-3).

### 1.    The January 5, 2021, Preparations

At 5:09 p.m., on January 5, 2021, at a store in Morgantown, West Virginia, appellant bought two cannisters each of Frontiersman bear spray and pepper spray (ECF 21:10). When appellant entered the store,

---

[3] The Bail Reform Act "permit[s] the [g]overnment to proceed by way of proffer in lieu of presenting live witnesses at a pretrial detention hearing." *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

he was on the phone; he told someone in the store that he was speaking with the friend who was accompanying him to the rally (*id.* 10-11). Phone records established a 39-second call between appellant and Khater at 4:49 p.m. on January 5, 2021 (*id.* 11). When appellant inquired, a person in the store told him that he could not take either his firearm or a pepper ball gun to Washington, D.C., but that he could take mace (*id.* 10).

## 2.    The January 6, 2021, Assault

The government provided the court and parties with 15 video exhibits previously introduced at appellant's detention hearing in the Northern District of West Virginia (ECF 21:4-5 n.4).[4]

On January 6, 2021, police officers stood behind a barrier of bike racks blocking the lower west terrace of the Capitol (ECF 21:4). They fended off rioters' repeated attempts to pull on the bike racks and move forward toward the Capitol (*id.*). At about 1:00 p.m., a crowd of rioters broke through a portion of the bike-rack barricade and assembled in areas on the lower west terrace (*id.*). Video surveillance (exhibit 3)

---

[4] Time stamp references followed by "p.m." referred to the actual time stamp marked on the video footage, located in the upper right (surveillance footage) or upper left (body worn camera) of the video frame. Otherwise, time references referred to the time of the video clip itself.

showed appellant (red hat, black backpack, and dark hooded sweatshirt) walk toward the lower west terrace followed by Khater (beanie with a pom-pom on top and a dark jacket) (*id.* 4-5). They separated briefly but reunited at 2:14:15 p.m. (*id.* 5). At 2:14:19 p.m., Khater, while standing behind appellant, appeared to reach inside appellant's backpack and retrieve something (*id.*).

The men's conduct was captured on "open source media video," exhibit 5 (ECF 21:5). As Khater made his way towards appellant, Khater stated, "Give me that bear shit," before reaching into appellant's backpack (*id.*). Appellant replied, "Hold on, hold on, not yet, not yet . . . it's still early" (*id.*). Khater then said, "They just fucking sprayed me" (*id.*). Khater held, in his right, black-gloved hand (marked "Trump"), a white can with a black top that appeared to be a can of chemical spray (*id.*):



Exhibit 5.1 (Still shot from Exhibit 5 at timestamp 00:36)

Exhibit 3 showed Khater and appellant standing together talking animatedly for the next few minutes (ECF 21:6). Surveillance footage (exhibit 4) showed Khater leave appellant at about 2:20 p.m. and walk to the bike-rack-barrier area (*id.*). Khater stood directly across from a line of law enforcement officers that included Brian Sicknick, Caroline Edwards, and Damion Chapman (*id.*). Video footage from Officer Chapman's body-worn camera (exhibit 7) showed that, at about 2:23:00, rioters began pulling on a bike rack to Chapman's left (*id.*).

Officer Chapman's body-worn camera footage showed that, within seconds, Khater, while standing about five to eight feet from the officers

and holding a canister in his hand, raised his right hand in the air, aimed in the officer's direction, and moved it from side to side (ECF 21:7):



Exhibit 7.1 (Still shot at 2:23:10 p.m.)

Surveillance and body-worn camera video showed the officers react to Khater spraying them in the face. They immediately retreated from the barricade line, brought their hands to their face, and rushed to find water to wash their eyes (*id.* 7). Still shots from video show Officer Sicknick bent over washing his eyes (exhibit 4.1) and Officer Edwards bent over in distress and requiring assistance (exhibit 4.2) (*id.* 7-8):



Exhibit 4.1 (Still photo of exhibit 4 at 2:23:25 p.m.)



Exhibit 4.2 (Still photo of exhibit 4 at 2:23:15 p.m.)

Surveillance video at 2:23:23 p.m. showed Khater continue to spray in the officers' direction (ECF: 21:8). Eventually, a police officer named Bagshaw noticed Khater's conduct and sprayed him; Bagshaw's body-

worn camera captured that spraying (*id.* 9). Khater disappeared from the surveillance cameras but reappeared again at 2:42 p.m., in the same location on the lower west terrace (*id.*). At that point, the police line had been breached and rioters had advanced to the upper terrace (*id.*). Khater appeared to be talking on his phone (*id.*). Phone records showed that Khater's phone connected with a phone number associated with appellant for 21 seconds at 2:42 p.m. (*id.* 10).

As a result of Khater's spraying, all three officers suffered injuries (ECF 21:11). Each was temporarily blinded, required medical attention, and needed assistance from other officers (*id.*). They were away from their duties for at least 20 minutes (*id.*). Officer Edwards reported lasting injuries underneath her eyes and scabbing that remained for weeks (*id.*).

### 3.    Post-Assault Investigation

On March 14, 2021, at appellant's home, officers found a backpack identical to the one he carried at the Capitol which held the chemical spray and, inside, a Sig Sauer nine-millimeter handgun and appellant's wallet and driver's license (ECF 21:11). Officers also recovered two canisters of Frontiersman brand bear spray and one canister of chemical spray (exhibit 14) (*id.*). The Frontiersman canisters were consistent in

color, shape, and size with the canister that Khater held at the Capitol (exhibit 13) (*id.*). At Khater's residence, officers recovered a hat, gloves, and Columbia jacket that matched those that Khater wore in the January 6 video footage (*id.*). In a pocket of a green jacket, officers found a spent canister of chemical spray (exhibit 15), which appeared to be identical to the canister recovered from appellant's residence (exhibit 14) (*id.*).

After his, arrest, Khater revealed that he picked up appellant in West Virginia and they drove together to Washington, D.C., on January 5, 2021 (ECF 21:12). They shared the backpack that appellant carried at the Capitol and that held the chemical spray; after the spraying incident, appellant and Khater remained on Capitol grounds (*id.*).

### *The Defense Proffer*

As relevant here, appellant denied conspiring to injure officers or aiding and abetting Khater's attack, which he maintained that he did not witness (ECF 19:2, 11). He proffered that he never assaulted any officer, caused bodily injury, or perpetrated any physical violence on restricted grounds (*id.*). Nor did he tear down any barriers, destroy any property, or enter the Capitol (*id.* 4, 11, 16).

Appellant explained that he had no prior felony convictions, was not a violent person, and was not part of any organization that promoted or engaged in political violence (ECF 19:2-3, 11-12). He is hard-working, has deep local ties, and is the father of three young children (*id.* 2-3, 12). Five witnesses testified to his good character at his March 22 detention hearing (*id.* 6; see ECF 19, Ex. 1 at 44-69).

Appellant contended that it was absurd to view his purchase of chemical sprays and his inquiry whether it was permissible to take certain weapons to Washington, D.C., as evidence of premeditation of violence (ECF 19:13). Rather, they proved an intent to follow the law and protect oneself (*id.*). Moreover, his denial of the bear spray when Khater requested it showed a lack of cooperation with Khater and intent to harm officers (*id.* 14). Finally, he argued that there was no evidence that, in the future, he would use chemical spray against officers, attempt to disrupt the functioning of government, or interact with Khater at all (*id.* 15-16). Appellant requested release on home detention with electronic monitoring and strict conditions (*id.* 17).

### *The Hearings*

At the April 27 hearing, Judge Hogan advised that he had read all of the pleadings and submissions (4/27:6). The government played the videos of the conduct engaged in by appellant and Khater (4/27:31-52). Appellant presented two witnesses who testified that he was kind-hearted and not violent or aggressive (4/27:67, 72). Sean Ruth testified that he planned to attend the rally with the men but could not get the day off (4/27:68). The plan was to support Donald Trump; they had no plan to go to the Capitol (*id.*).

At the May 11 hearing, appellant presented Scott Biddle, manager of a firearms and accessories store in Morgantown, West Virginia (5/11:5-6). Biddle testified that appellant came to the store in January and explained that he was traveling to the Trump rally and was concerned about his safety (5/11:6-7). He asked whether he could take with him his firearm or a pepper ball shooter that he saw in the store; Biddle advised that neither item was legal in Washington, D.C., but that aerosols were permissible (*id.*). Appellant bought two cans each of bear spray and red pepper gel (5/11:8-9). Not long after appellant entered the store, he received a phone call and spoke with the caller (5/11:6).

### *The District Court's Findings*

The district court ordered pretrial detention, finding by clear and convincing evidence that no condition or combination of conditions would reasonably assure the safety of any other person or the community (5/11:37, 58-59). It found the following.

After a conversation with Khater, appellant bought bear spray and mace (5/11:39). Khater and appellant first appeared at the lower west terrace of the Capitol around 2:09 p.m. [on January 6, 2021] (5/11:34, 37.). The men were "away from the police barricades" (5/11:37). At 2:11:15, police sprayed the crowd with a "Super Soaker" but Khater was not close to the spraying, did not appear "in line to get sprayed," and did not show any effect of having been sprayed (5/11:34-35). At 2:14 p.m., Khater, who had "strayed towards the police line," returned to appellant and said, "'Give me that bear shit'" (5/11:37). While Khater told appellant "that, inaudible, 'f'ing sprayed me,'" the video did not show Khater reacting as if he had been actually hit with spray – he did not rub his eyes or bend over as officers did when appellant eventually sprayed them (5/11:35-38).

At 2:14:30 p.m., Khater took bear spray from appellant's backpack (5/11:35). Appellant told appellant, "'Hold on. Hold on. Not yet, not yet,

not yet. It's still early[.]'" (5/11:37.) The remaining conversation was inaudible (*id.*). Khater could have taken the mace out as he spoke with appellant (5/11:35). At 2:20, Khater left appellant and went to the bike-rack barriers (5/11:38). At 2:23, Officer Bagshaw sprayed the crowd with the Super Soaker but Khater was "not close to being hit by that spray" (*id.*).

Seconds later, Khater approached the front line of the police barricade and waved his arm back and forth in an arc, spraying a small cannister "apparently like mace" (5/11:38). At 2:23:08 p.m., Khater sprayed Officer Sicknick and then Officer Chapman (5/11:35, 38). Four seconds later, Khater stepped forward to the front of the police line and extended his arm "directly at [Officer Edwards's] face and sprayed her directly" "at a point-blank range" (5/11:35-36, 38). At 2:23:13, Officer Edwards "[took] cover" and was "blinded by the attack" (5/11:39).

At 2:23:21, Khater did "a second spray in general of the police officers"; he was then sprayed by Officer Bagshaw at 2:23:26 p.m. (5/11:34, 36, 39). Because nine minutes passed between Khater's remark that he had been sprayed, and his spraying assault on the officers, Judge Hogan rejected the claim that Khater's spraying of the officers was "an

immediate reaction beyond his control" to having been sprayed by police (5/11:35). As Khater sprayed the second group of officers, the crowd began its "breakthrough" of the bike-rack barriers (5/11:38). Appellant was filming the attack on the police line (5/11:36).

Judge Hogan reviewed the statutory factors in 18 U.S.C. § 3142(g). He noted that this Court in *Munchel* provided guidance in weighing the relative dangerousness of various January 6 lawbreakers at the Capitol (5/11:42). Regarding the nature and circumstances of the offenses charged, Judge Hogan found that appellant and Khater were each charged with nine serious felony offenses, they were charged in various counts with crimes of violence, and they faced "the greatest number . . . and more serious charges" than he had seen in his various "riot cases" (5/11:40-41, 47). He concluded that appellant and Khater planned and coordinated use of the sprays as weapons at the Capitol and that appellant aided and abetted Khater's assault on police (5/11:47-52). Judge Hogan pointed to: 1) their phone conversation before appellant bought the sprays; 2) their travel together to Washington with the sprays; 3) the fact that they stood together and talked for several minutes as the crowd became excited and attacked police; 4) appellant's statement

to Khater, when Khater asked for the bear spray, that it was "too early" and to "hold on"; and 5) their communication by phone once the riot started (5/11:49). Judge Hogan concluded that the men had an understanding that they were going to "use this product," i.e., the mace and bear spray, against the police (5/11:49-50). Moreover, the timeline showed that their use of the spray coincided with the rioters' efforts to move the bike-rack barriers, "contributed to the crowd's ability to breach the police line," and ultimately "played a role in the ultimate breach in the attack of the Capitol" (5/11:50-51). The video showed that the three officers were disabled and that other officers had to care for them (5/11:50). Appellant, the court noted, filmed Khater as Khater maced the officers (5/11:48). These actions, the court concluded, "indicate[d] a finding of dangerousness"; their concerted efforts to undermine law enforcement weighed heavily towards detention (5/11:51).

Judge Hogan explained that he considered that neither man belonged to an extremist group (5/11:53). He concluded that while mace may be legal, it became a dangerous weapon under 18 U.S.C. § 111 when Khater and appellant used it to attack police, who suffered "serious injuries" (5/11:53-54). Their use of a dangerous weapon "indicate[d] . . .a

level of dangerousness" (5/11:53). Judge Hogan found that both men fell "in the elevated category of dangerousness under *Munchel*" (5/11:54).

Regarding their "history and characteristics," Judge Hogan found that the history of both men was "all good" because they had no prior felonies, they had ties to the community and their families, and they were both fully employed (5/11:41).

Regarding the "weight of evidence," Judge Hogan found that the video evidence was "clear" and "there's little doubt as to what transpired" (5/11:54). The weight of the evidence strongly supported the government's contention that the men posed a threat to the community (5/11:55). While their history and characteristics, including their "excellent backgrounds," did not weigh in favor of detention, Judge Hogan could not "find a way around" the fact of their attack on multiple, uniformed police officers, which showed disregard for law and order and those sworn to uphold it and that they were a danger to the community (5/11:56).

Judge Hogan concluded that the actions of appellant and Khater "'make apparent that [] [they] will follow [their] beliefs and [] fellow gang members, even when the laws designed to protect our democracy prohibit

[their] conduct" and demonstrated that they "'cannot be trusted to abide by any conditions of release'" (5/11:57) (citation omitted). He found that clear and convincing evidence established that appellant and Khater "remain a danger to the community" (5/11:59).

## ARGUMENT

### A.    Standard of Review and Legal Principles

"[T]he [district] court 'shall order' a defendant detained before trial if it 'finds that no condition or combination or conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *Munchel*, 991 F.3d at 1279 (quoting 18 U.S.C. § 3142(e)). The court must consider the: (1) nature and circumstances of the offense charged; (2) weight of the evidence against the person; (3) history and characteristics of the person; and (4) nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

To detain a defendant, the government must prove dangerousness by clear and convincing evidence, and to order a defendant preventively detained [based on dangerousness], a court must identify an articulable threat posed by the defendant to an individual or the community."

*Munchel*, 991 F.3d at 1279-80, 1283. "In [this Court's] view, those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id.* at 1284. "[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy, and [] those who participated could rightly be subject to detention to safeguard the community." *Id.* at 1284-85. Nevertheless, the dangerousness determination is individualized and "factbound." *Id.* at 1283.

This Court reviews the district court's findings for clear error. *Munchel*, 991 F.3d at 1282. That standard "'applies not only to the factual predicates underlying the district court's decision, but also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release.'" *United States v. Hale-Cusanelli*, No. 21-3029, 2021 WL 2816245, at *4 (D.C. Cir. July 7, 2021) (internal quotation omitted).

This Court reviews questions of law de novo. However, where a defendant fails to raise an objection in the district court, this Court

reviews for plain error only. *United States v. Hunter,* 786 F.3d 1006, 1010 (D.C. Cir. 2015). "'To overturn a district court's decision under plain error review, [this Court] must find that there is (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are satisfied, [this Court] ha[as] discretion to remedy the error only if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (citation omitted).

### B. Appellant Fails to Show Legal Error, Plain or Otherwise, in the District Court's Finding of Dangerousness

Appellant alleges that Judge Hogan erred as a matter of law by erroneously presuming dangerousness and detention for any defendant accused of violent conduct during the Capitol riot (Mem:14-16). He did not complain at the detention hearing that Judge Hogan applied a mandatory presumption, and does not show error here, plain or otherwise. He misreads the district court's remarks.

At the outset of his analysis, Judge Hogan reviewed this Court's previous bail opinions stemming from the Capitol riot (5/11:41-46). He explained that his "guideline" was the opinion in *Munchel,* which "sets forth a categorical approach" and "delineates an elevated category of

dangerousness" to those who assaulted officers and broke windows, doors, and barricades, and, inter alia, to their aiders and abettors and co-conspirators, as opposed to those who cheered the violence or entered the Capitol after others cleared the way (5/11:47). He explained that the subsequent unpublished opinion in *United States v. Worrell,* Appeal No. 21-3020 (D.C. Cir. May 5, 2021), written by *Munchel's* author, approached the question of dangerousness by "splitting rioters into two buckets" (*id.*).

Appellant maintains that Judge Hogan's reference to this portion of *Munchel* demonstrated that he believed that those who fell into the "bucket" of rioters charged with violence were to "be treated more harshly," presumed to be dangerous in the future, and required to "rebut this newly created presumption" (Mem:14-15). The record refutes that claim. First, appellant notes Judge Hogan's comment that those in the elevated category "necessarily impose a concrete prospective threat" (Mem:14; see 5/11:42). But Judge Hogan then remarked that Judge Lamberth in "*Fairlamb*"[5] "laid that out fairly well" by explaining that

---

[5] *United States v. Fairlamb*, 2021 WL 1614821 (D.D.C. Apr. 26, 2021).

those in the "former category are more dangerous" (5/11:42-43). Judge

Hogan explained that *Munchel, Worrell, and Fairlamb* together

established that, "if a rioter in the elevated category presents a per se

concrete and prospective threat, . . . we have to decide whether the

defendant is too dangerous based upon that conduct to be released or is

not" (5/11:43). The court's statements that it had "to decide" whether

appellant was too dangerous to release belies appellant's claim that the

court believed it was required to presume detention of any defendant in

the "elevated category."

Moreover, the court continued:

> **I think *Munchel* does not set a hard-line rule. I don't
> think that the categories are solely determinative,** but
> it creates something like a guideline for the Court to follow so
> that someone that's a violent defendant is presumed to pose a
> concrete and prospective threat, and a nonviolent defendant's
> presumed not to pose such a threat. **But every
> circumstance is different in every case, and you have
> to look at individual cases.**
>
> **And you have to find what the ultimate conclusion
> would be, that the government may well not overcome
> the concrete and clear and convincing evidence
> requirement** . . . [.] But I don't know how else to treat the
> D.C. Circuit's explicit categorizations . . . those individuals
> who pose a threat because they attacked police officers
> without cause, **while ensuring the defendants have an
> individualized assessment of any future threats.**
> (5/11:43-44) (emphasis added.)

The highlighted language shows that the court did not apply a presumption of detention, as appellant claims (Mem:14-16). Rather, Judge Hogan expressly recognized that *Munchel* did "not set a hard-line rule" or create "determinative" categories; that "every circumstance is different in every case"; that he was required "to look at individual cases," make "an individualized assessment of any future threats," and reach an "ultimate conclusion"; and that even for violent defendants, the government "may well not overcome the concrete and clear and convincing evidence requirement" (5/11:43-44). Read as a whole, Judge Hogan's remarks simply reflect both the commonsense distinction this Court drew between violent and nonviolent conduct at the Capitol and the acknowledgement that, for those who fell into the elevated "bucket," the district court still needed to perform an individualized assessment of dangerousness. This Court recently explained that its point in *Munchel* "was that everyone who entered the Capitol on January 6 did not necessarily pose the same risk of danger and the preventative detention statute should apply to the January 6 defendants the same as it applies to everyone else[.]" *Hale-Cusanelli,* 2021 WL 2816245 at *5. Judge Hogan's ruling was consistent with that pronouncement.

In any event, Judge Hogan performed an individualized assessment (5/11:46-59). Citing language from other district court opinions, he concluded that appellant and Khater's coordinated attack on law enforcement sought to cause mayhem on Capitol grounds and assisted in the ultimate breach of the Capitol (5/11:51-52). Moreover, their planning at the Capitol before the spraying showed both the "'premeditated component of an attempt to halt the operation of our democratic process'" and the danger that both men posed to the community in which they reside and to "'the American public as a whole'" (5/11:52-53). Judge Hogan found that the unprovoked chemical spraying into the officers' unprotected faces was "egregious" conduct that caused the officers serious injury, and it facilitated the "riotous mob['s]" attack on police (5/11:53-55, 57). He concluded that given Khater's conduct in "violently assaulting . . . multiple officers," appellant and Khater evinced "a disregard for law and order and for those sworn to uphold it" and "show[ed] themselves to be a danger to the community" (5/11:56) (internal quotation omitted).

Judge Hogan was not persuaded that home confinement would mitigate the men's prospective danger given their "demonstrated

willingness to engage in violence in furtherance of [their] beliefs" and to follow "'fellow gang members, even when the laws designed to protect our democracy prohibit [their] conduct'" (5/11:56-57). Judge Hogan concluded that the men's excellent background and character did not outweigh the dangerousness demonstrated by their unprovoked violent attack and that the government established by clear and convincing evidence that they remained a danger to the community (5/11:58-59).

These findings in sum demonstrate that Judge Hogan did not order detention because he believed that, having concluded that appellant aided and abetted Khater's violence on January 6, detention was presumed. Rather, he engaged in a fact-bound, individualized assessment of the prospective danger posed by appellant and Khater. Appellant has not shown legal error, let alone obvious legal error.

## C.    Appellant Has Not Shown Clear Error in the District Court's Factual Findings

Appellant argues that the district court clearly erred in finding that he aided and abetted Khater because there was no evidence that he that he participated in the assault as something that he wished to bring about

(Mem:17-20).[6] But appellant simply argues his own view of the evidence. There was ample evidence in the record to support Judge Hogan's aiding-and-abetting finding.

Appellant's conversation with Khater before buying the sprays, his purchase of multiple sprays, his travel with Khater together with the sprays, and Khater's access to the sprays at the Capitol showed appellant's intent to share use of the sprays with Khater. The evidence that appellant and Khater talked together for several minutes as the crowd became excited and attacked police, coupled with appellant's statement that it was "too early" for the bear spray and that Khater should "hold on" regarding using it, showed appellant's intent that the chemical spray be used against police. Although Tanios claims he intended just to use the sprays for self-defense (Mem:17-18), there was no evidence of counter-protestors or others potential attackers for whom appellant would have been reserving the spray: the only imminent violence was between the crowd and police. Indeed, within seconds of

---

[6] The Supreme Court has held that under 18 U.S.C. § 2, "'those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime.'" *Rosemond v. United States,* 572 U.S. 65, 71 (2014) (citations omitted).

Khater beginning to spray the police, the crowd began its successful breakthrough of the barrier. Judge Hogan reasonably could infer that appellant's timing concern pertained only to the best opportunity to overwhelm police. Appellant's filming of the attack on the police line further showed that appellant aligned himself with Khater's violent actions. Based on all this evidence, the district court did not clearly err in finding that appellant aided and abetted Khater's assaults.

Nor did the district court clearly err in its dangerousness assessment. Judge Hogan's detailed findings (5/11:46-58) belie appellant's claim (Mem.:20-22) that the judge failed explain why he found that appellant poses an identified and articulable future threat. Although appellant argues (at 21-22) that the January 6 events will never re-occur, the district court reasonably found that Khater and appellant's violent attack on multiple police officers showed their disregard for law enforcement and thus established their future dangerousness to the community (5/11:56-67).

Appellant's disagreement with the court's assessment of his dangerousness is insufficient to establish clear error because "'[w]here there are two permissible views of the evidence, the factfinder's choice

between them cannot be clearly erroneous.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

## CONCLUSION

WHEREFORE, the government respectfully submits that the order of the district court should be affirmed.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney

CHRISELLEN R. KOLB
ELIZABETH H. DANELLO
GILEAD I. LIGHT
ANTHONY F. SCARPELLI
Assistant United States Attorneys

_____/s/_____
PATRICIA A. HEFFERNAN
D.C. Bar #455761
Assistant United States Attorney
555 Fourth Street, NW, Room 8104
Washington, D.C. 20530
Patricia.Heffernan@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 27(d)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this motion contains 5,189 words, and therefore complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). This motion has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
PATRICIA A. HEFFERNAN
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Appellee's Memorandum of Law and Fact to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, L. Richard Walker, Esq., Richard_Walker@fd.org, on this 20th day of July, 2021.

/s/
PATRICIA A. HEFFERNAN
Assistant United States Attorney