ORAL ARGUMENT NOT YET SCHEDULED

APPELLANT'S REPLY MEMORANDUM OF LAW AND FACT
_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

No. 21-3034
_____

UNITED STATES OF AMERICA,                              Appellee,

v.

GEORGE TANIOS,                                          Appellant.
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
_____

> L. Richard Walker
> Attorney for Appellant
> Bar No.: 63132
> Federal Public Defender Office
> Huntington Bank Building
> 320 W. Pike St., Suite 360
> Clarksburg, WV 26301
> Tel. (304) 622-3823
> E-Mail. Richard_Walker@fd.org
> Counsel for Oral Argument

**District Court**
**Cr No. 21-222 (TFH)**

# ARGUMENT

**A. The District Court erred as a matter of law by determining that *Munchel* creates a presumption of detention for those accused of violence on January 6 and that those defendants, including Tanios, are subject to more harsh treatment at the detention stage**.

In furtherance of its continuing effort to detain a respected, family-oriented man, with a small business, excellent background, and no history of violence, the Government's Memorandum of Law and Fact vigorously defends the District Court's detention order. *See* Document #190700.

To begin, the Government argues in favor of the District Court's flawed interpretation of *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021). The District Court misinterpreted one line of dicta in *Munchel* and formulated a "categorical approach" that places alleged violent defendants in a group that "necessarily imposes a concrete prospective threat." 5/11:42. Therefore, these defendants, including Tanios, are "presumed to pose a concrete and prospective threat" to the community. 5/11:43.

The Government contends this misapplication of law is acceptable because the District Court merely considered the fictitious "categorical approach" to be a "guideline," rather than a "hard-line rule." Government's Memorandum of Law and Fact at 21. Furthermore, the Government argues that the District Court did not materially deviate from established procedure under the Bail Reform Act because

1

the District Court acknowledged that, despite Tanios's negative categorization, it would have "to decide" whether Tanios is too dangerous to be released. *Id*. 22-23. Still, this is not the law and the District Court created an extra burden for Tanios. In common parlance, the District Court put Tanios in a hole that he had to dig out of to secure his release. This was entirely unfair and not legal.[1]

Recently, this Court rejected any sort of categorical approach based upon *Munchel*:

> The point of *Munchel* was that everyone who entered the Capitol on January 6 did not necessarily pose the same risk of danger and the preventive detention statue should apply to the January 6 defendants the same as it applies to everyone else, not that the January 6 defendants should get the special treatment of an automatic exemption from detention if they did not commit violence that particular day.

*United States v. Hale-Cusanelli*, No. 21-3023, WL 2816245 at *5 (July 7, 2021 D.C. Cir.). Accordingly, we know *Munchel* did ***not*** create a categorical approach. *Munchel* did ***not*** authorize the District Court to place Tanios is a specified "bucket" for special treatment. *Munchel* did ***not*** create a presumption of any kind

---

[1] The Government suggests that Tanios failed to make a timely objection. Government's Memorandum of Law and Fact at 20-21. Preservation of this claim is not a serious issue in this case. Tanios did not object to this legal error because it did not become apparent until the middle of the District Court's dictation of the lengthy bench opinion, at the conclusion of the third detention hearing. 5/11:32-59. *See* Fed.R.Crim.P. 51 (a) (exceptions to rulings or orders are unnecessary to preserve claimed error).

2

that applied to Tanios. *Munchel* did not even create a "guideline" for the District Court to follow in this case or any other. Unquestionably, with its approach, the District Court placed Tanios at a highly disadvantaged starting point. This was inappropriate and a clear legal error because it constituted a departure from the Bail Reform Act, it was not supported by any published precedent of this Court, and it prejudiced Tanios. This Court should reverse the detention order on this basis alone.

> **B. The District Court clearly erred in finding that Tanios aided and abetted his co-defendant's assault on law enforcement officers and, therefore, should be placed in an "elevated category of dangerous defendants."**

Tanios has no prior convictions for violent offenses and Tanios does not have a reputation for violence. 4/27:67. Tanios is not dangerous and he did not commit violent acts at the Capitol on January 6. Specifically, Tanios did not aid and abet his co-defendant, Julian Khater. 5/11:51-52.

The Government argues that Tanios was far more than a bystander and that any claim of innocence is self-serving and a matter of perspective. Government's Memorandum of Law and Fact at 26-27. Rather, Tanios's lack of criminal involvement is a matter of the evidence in the record. The Government had the burden of proof at all three detention hearings. The Government failed to prove by clear and convincing evidence that Tanios ***knowingly and intentionally*** participated in Khater's assault on law enforcement officers. Therefore, the

3

District Court erred in making its finding that Tanios engaged in an assault as an aider and abettor. 5/11:51-52.

First, the Government argues that Tanios had an "intent to share" chemical sprays with Khater because (a) Khater called Tanios while Tanios was purchasing chemical spray in West Virginia; (b) they traveled together with multiple canisters of spray; and (c) Khater had access to the spray. *Id*. at 27. It is not in dispute that Khater called Tanios on January 5. This is perfectly normal behavior because the men planned to attend the Trump Rally together the next day.

This telephone call does not suggest any criminal intent. There is no evidence that during the call Tanios told Khater he was at ATR Performance in Morgantown, which sold chemical spray, or that Tanios planned to purchase chemical spray to harm law enforcement officers. To the contrary, the only relevant evidence presented by the manager of ATR Performance, William Biddle, indicates that Tanios's purchase of chemical spray was legal and not suspicious. Biddle testified that he recommended the spray to Tanios for self-defense, given that Tanios was "concerned about being protected while he was at [the Trump Rally]." 5/11:6-7.

It is totally irrelevant that Khater and Tanios traveled together with the chemical sprays in the car. Again, there is no evidence that Tanios discussed his purchase or possession of chemical sprays during the trip, much less that Tanios

4

suggested the sprays should be used on law enforcement, rather than for self-defense.

The number of canisters is not suggestive of an intent to do harm to law enforcement either. Tanios proffered that he purchased four containers of non-lethal chemical spray because he knew Trump supporters had been violently attacked in connection with similar political events by people opposing President Trump. ECF 24:8-9. The Government presented no evidence about a limit to the number of canisters a person may purchase.

At the time of the purchase, on January 5, Tanios could not fully appreciate the actual level of danger in DC on January 6. However, Tanios knew this would be a major rally, which could have suggested an increased level of danger. Tanios knew he would be in DC for more than one day. Tanios knew he would have to travel many hours to and from DC. If Tanios risked being assaulted numerous times in DC and perhaps elsewhere, by numerous people, over the course of more than one day, it is not unreasonable to have numerous canisters of chemical sprays for self-defense.

Furthermore, it is specious for the Government to argue that Khater had "access" to the chemical sprays Tanios possessed. *Id*. at 27. The Government's own exhibits show that Tanios denied access to the spray on Capitol grounds, when Khater demanded the "bear shit," referring to bear spray. S*ee* Government

5

Exhibit 5 & Exhibit 7. Khater never got away with the bear spray, but, somehow, at some point, Khater got his hands on a smaller canister of spray, designed to attach to a key chain, which Khater used to assault officers on his own, while separated from Tanios.

The Government claims that Tanios had an intent to use the chemical sprays against law enforcement officers because Tanios and Khater "talked together for several minutes" and Tanios said it was "too early" to use sprays and Khater should "hold on." Government's Memorandum of Law and Fact at 27. During this conversation, partially captured on the open source "Convo Couch" media video, Tanios rejected the request by Khater to tender any bear spray. S*ee* Government Exhibit 5. What's more, Tanios argued against the use of spray on law enforcement.

The Government's Memorandum of Law and Fact makes an argument based upon short clips from the Convo Couch video. The entire conversation is more telling:

   Khater:  "Give me that bear shit."  :05-06 (seconds)

   Tanios:  "Oh my God…focus, focus."  :09
        "Don't do it, don't do it, Julian."  :10-12
        "Hold on, hold on, not yet, it's still early" :19

   Khater:  "Gimmie that. Give it to me" :27-28

   Tanios:  "Listen, listen" :30-31

>   Khater:     "They just fucking sprayed me!"
>
>   Tanios:     "No, it's not about [that]" :37-38

Government Exhibit 5.[2]

Clearly, based on the totality of the recorded conversation, there is ***no agreement*** between Tanios and Khater. Tanios did ***not*** join in Khater's plan to use spray against others on Capitol grounds. Tanios ***disagreed*** with Khater. What's more, the evidence suggests that Tanios and Khater argued about this for quite some time. Obviously, if the men had a plan to assault officers, Tanios would have quickly handed the spray to Khater.

Next, the Government argues that the lack of counter-protesters on Capitol grounds undercuts Tanios's argument that the spray was intended for self-defense. Government's Memorandum of Law and Fact at 27. There is no evidence to support the Government's position. The Government never proved the absence of people adverse to Trump in the group of at the Capitol on January 6. The Government cannot know who was present and all the intentions, until the entire investigation is complete. The investigation of January 6, according to the

---

[2] We have listened to the Convo Couch video many times. Certain portions are somewhat difficult to hear, but we have determined this to be the most accurate transcription of the conversation between Tanios and Khater. This transcription has been created in-house, by the attorneys in our office with the assistance of staff members, including the Federal Defender's Computer Systems Administrator who has the ability to use certain high-end, Poly Voyager UC 2 headphones, which we recommend for this Court's review, rather than a normal speaker.

7

Government's own public reports, it is one of the largest and most complicated in American History. Therefore, this Court should disregard this highly speculative argument.

The Government argues that the specific timing of Khater's assault indicates that the two men had a plan to assault officers on Capitol grounds. Government's Memorandum of Law and Fact at 28. Given that Khater sprayed law enforcement "within seconds" of a breakthrough of a bike-rack style barrier -- the argument goes -- the two men must have planned the assault. *Id.* In light of the evidence, this is not entirely accurate.

Government Exhibit 4 is a video recording from a pole camera on Capitol grounds. At 00:5:30, on Exhibit 4, protesters are seen pulling on and removing one segment of the bike-rack style barricade. At 00:5:35, several law enforcement officers react, and one officer begins to spray the offending protesters with a "super soaker" style canister of chemical spray. At 00:5:37, most people in the crowd in that area retreat, due to the high volume of chemical spray, including Tanios. Temporarily, a second segment of the barrier was removed by the crowd.

At 00:5:38, it appears Khater was in the vicinity of the spray from the officer using the super soaker canister and Khater may have been sprayed. Then, at 00:5:42, Khater sprayed officers. *Id*. The evidence shows Khater sprayed officers *after* the line had been broken, not before. Therefore, the more accurate

8

assessment of the evidence is that Khater sprayed officers ***in reaction to being sprayed or nearly sprayed***, rather than as a part of a timed and coordinated plan to breach the barrier.

Finally, the Government argues that Tanios's filming of the attack on the police line shows that Tanios "aligned himself" with Khater's violent actions. Government's Memorandum of Law and Fact at 28. This is misleading, too. Government Exhibit 4 shows that Tanios did not record protesters fighting with police at the line of officers and Tanios did not record Khater spraying law enforcement officers.

Tanios left the area almost immediately after some members of the crowd began to remove the first segment of the bike-rack barrier. As indicated above, Government Exhibit 4 shows that Tanios left as soon as an officer began to deploy a high volume of chemical spray in his direction. Tanios was not present and was no longer recording, based upon Government Exhibit 4, at the time people began to fight with officers and when Khater sprayed officers. Accordingly, Tanios's filming did not show a connection between Tanios and the assault on officers because it did not occur at the time of the assault on officers as alleged in the Government's Memorandum of Law and Fact.

9

### C. The District Court clearly erred in failing to find that Tanios posed an articulable future threat to an individual or the community in view of his conduct on January 6 and the circumstances of that day.

The District Court erred in its assessment of dangerousness. Government's Memorandum of Law and Fact at 25-26, 28. First, while the District Court indicated that it looked at the specific facts of the case to determine dangerousness, it relied upon facts not in the record, misleading interpretations of facts, and certain facts which are not true, as discussed above in Part B. A dangerousness determination based upon findings of facts which are clearly erroneous cannot meet the requirement set forth in *Munchel*.

Second, the District Court failed to consider whether Tanios presented an identifiable or articulable future threat to the community or any other person as required by *Munchel* at 1282-1283. The District Court placed an overwhelming emphasis upon the ***alleged*** offense conduct. 5/11:56-57. It proceeded to presume that if Tanios committed the offense of aiding and abetting an assault upon law enforcement once, then he will do something similar again. *Id*. Making matters worse, the District Court entirely ignored 9 out of the 10 special conditions proposed by Tanios, which would have created a virtual jail cell for Tanios inside his home so that he can help care for his family pending trial.[3] ECF 21:16-17. Tanios contends the District Court's conclusion about dangerousness lacked

---

[3] There is no trial date, so this appeal is critical for Tanios.

sufficient explanation. Judicial decisions should be reasoned decisions and this is particularly true for detention orders. *See* 18 U.S.C. § 3142(g)(requiring written statement of the reasons for detention).

## CONCLUSION

Based upon the reasons stated, this Court should reverse the District Court's Order detaining Tanios.


By:	/s/ *L. Richard Walker*
	L. Richard Walker
	First Assistant Defender
	Attorney for Appellant
	Bar No.: 63132
	Federal Defender Office
	Huntington Bank Building
	320 W. Pike St., Suite 360
	Clarksburg, WV 26302
	Tel. (304) 622-3823
	E-Mail Richard_Walker@fd.org

## CERTIFICATION OF SERVICE

I hereby certify that on July 28, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: /s/ *L. Richard Walker*
L. Richard Walker
Attorney for Appellant
Bar No.: 63132
Federal Public Defender Office
Huntingdon Bank Building
320 W. Pike St., Suite 360
Clarksburg, WV 26302
Tel. (304) 622-3823
E-Mail. Richard_Walker@fd.org

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 32(g) and Fed. R. App. P. 27(d)(2)(A), that the Reply Memorandum Of Law And Fact was prepared in Times New Roman 14 point font and contains 2525 words.

By: /s/ *L. Richard Walker*
L. Richard Walker